UNITED STATES, Appellee

v.

Melvin E. HARDY, III, Specialist
U.S. Army, Appellant.

No. 96–0356.
Crim. App. No. 9401257.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 21, 1996.

Decided April 8, 1997.

For Appellant: *Captain Eric S. Krauss*
(argued); *Lieutenant Colonel John T. Ruck-
er, Lieutenant Colonel Michael L. Walters,*

and *Captain Matthew A. Myers, Sr.* (on brief); *Colonel Stephen D. Smith.*

For Appellee: *Captain David F. Musel* (argued); *Colonel John M. Smith, Lieutenant Colonel Eva M. Novak,* and *Major Lyle D. Jentzer* (on brief).

*Amicus Curiae* Urging Reversal: *Robert E. Sletvold* (law student) (argued); *Ada Long–Croom* (supervising attorney) (on brief)-for the Dickinson School of Law, Carlisle, PA.

### Opinion of the Court

EFFRON, Judge:

In a contested general court-martial at Fort Hood, Texas, officer and enlisted members convicted appellant of forcible oral sodomy in violation of Article 125, Uniform Code of Military Justice, 10 USC § 925, but acquitted him of rape and attempted forcible anal sodomy.[1] They sentenced him to a dishonorable discharge, confinement for 5 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Criminal Appeals affirmed without written opinion.

We granted review of the following issue: WHETHER THE MILITARY JUDGE DEPRIVED APPELLANT OF HIS RIGHT TO DUE PROCESS AND TO A FAIR TRIAL WHEN THE JUDGE RESPONDED INCORRECTLY TO A QUESTION REGARDING JURY NULLIFICATION WHICH WAS ASKED BY THE PANEL AND PRESENTED TO THE MILITARY JUDGE IN OPEN COURT DURING DELIBERATIONS ON FINDINGS.[2]

We hold that the military judge did not err.

### I

### A

After each party had concluded its presentation of evidence at the findings stage of the trial, the military judge instructed the members of the court-martial panel on the issues raised by the evidence. The instructions included guidance on the issues of consent, intoxication of the victim as it might have affected her ability to consent, mistake of fact as to the victim's consent, and appellant's voluntary intoxication. The military judge also instructed the members that they had the responsibility to "impartially resolve the ultimate issue as to whether the accused is guilty or not guilty in accordance with the law, the evidence admitted in court, and your own conscience."

When the military judge asked whether "counsel for either side have any objections to the instructions given, or a request for additional instructions ...," both counsel responded in the negative.[3] The members then began their deliberations.

After deliberating for about 3 hours, the members returned to the courtroom with the following question, which was presented to the military judge by the president of the panel: "[I]f we find that both—that all elements of the charge are present, that does not necessarily mean that we still have to find the defendant guilty of that charge, is that correct?" The military judge responded to this question by telling the panel to consider "all the instructions" previously given on the elements of the offense and applicable defenses, and he discussed an example involving the mistake-of-fact defense.[4] Thereafter, the president of the panel indicated that the military judge's response answered the members' question, and the record reflects an affirmative response by the rest of the members.

After addressing a separate question, the military judge asked counsel whether either

---

1. *See* Arts. 120 and 80, Uniform Code of Military Justice, 10 USC §§ 920 and 880, respectively. These charges were related to the same incident as the forcible oral sodomy charge.

2. We heard oral argument in this case at the Dickinson School of Law, Carlisle, PA, as part of "Project Outreach." *See United States v. Frazier,* 34 MJ 194, 195 n. 1 (CMA 1992).

3. Civilian defense counsel noted for the record previous discussions with respect to other instructions not relevant to the granted issue.

4. *See* Part III of text, *infra,* discussing the military judge's use of this example.

wanted an out-of-court session under Article 39(a), UCMJ, 10 USC § 839(a), "to discuss further the instructions that I've given." Trial counsel responded affirmatively, and the military judge excused the members from the courtroom.

During the Article 39(a) session, trial counsel asked the military judge to instruct the members that "if the government has proven each and every element beyond a reasonable doubt, and if there's no defenses to that (sic), then they must find the individual guilty." The military judge responded, "Well, I think that's pretty much what I said. How would you want me to say it differently?" [5]

While trial counsel was considering his response, the military judge asked civilian defense counsel for his comments. Civilian defense counsel raised no objection to what the military judge had said but did object to what was left unsaid. Defense counsel contended that the panel's question asked for guidance on the subject of jury nullification and that the response of the military judge did not

> reflect the state of the law ... that juries in the United States have had the ability to, in essence, review the wisdom of the charges, the discretion of the prosecutor, and ... even if it does find ... sufficient facts to prove beyond a reasonable doubt each and every element, and that there is no ... evidence supporting a defense, that they still have the discretion to enter a finding of not guilty in a case. ... [B]ecause the court members are not only just reviewing the factual sufficiency of the government's case when they make a finding of guilty or not guilty, they are also reviewing the wisdom and discretion of—in the civilian world, the prosecutor—in this world, the accuser, of bringing the charges,

the wisdom of the convening authority in referring the charges to trial.

Based on this view of the law, civilian defense counsel then asked the military judge to "instruct the court members that ... in their exercise of their peer discretion, ... they may find him not guilty, notwithstanding findings that there is evidence beyond a reasonable doubt to sustain each and every element of the offense, and [their] finding expressly that there are no affirmative defenses...." The military judge declined to give the proposed instruction, stating, "Well, I disagree with you completely on that."

The military judge then turned to trial counsel, who continued to indicate his dissatisfaction with the military judge's failure expressly to direct the members that they must find appellant guilty "if we have met our burden beyond a reasonable doubt, and if there ... [are] no defenses ...." The military judge declined to give such an instruction, stating, "Well, I think I've adequately instructed the panel on the questions." The military judge then asked either counsel if they had anything further, and both responded in the negative.

Aside from the issue of jury nullification, civilian defense counsel expressed no concern about the military judge's instructions, including his responses to the panel's questions. The members resumed their deliberations and found appellant not guilty of rape and attempted forcible anal sodomy but guilty of forcible oral sodomy.

## B

We have not ruled directly on the issue of whether a court-martial panel should be instructed on the subject of jury nullification

---

5. The military judge's response and his subsequent question make it clear that he was expressing only general agreement with trial counsel's comment and was not adopting it verbatim. The actual instruction given to the members by the military judge, taken from the Military Judges' Benchbook at 2–69 (Dept. of the Army Pamphlet 27–9)(Update Memo 11, Jul. 1994), stated: "If, on the whole evidence, you're satisfied beyond a reasonable doubt of the truth of each and every element, you *should* find the accused guilty."

(Emphasis added.) Neither the military judge's instructions prior to findings nor his response to the members' subsequent questions stated that the members "must" return a finding of guilty if the elements were proved. In fact, the military judge repeatedly declined trial counsel's request to give such an instruction. *See* text, 46 MJ at 70. Accordingly, the propriety of such a mandatory instruction is not at issue in this case. *See United States v. Hayward*, 420 F.2d 142 (D.C.Cir. 1969).

prior to its deliberations on findings. We have observed, however, in the context of a case involving judicial notice, that although "civilian juries and court-martial members always have had the power to disregard instructions on matters of law given them by the judge, generally it has been held that they need not be advised as to this power, even upon request by a defendant." *United States v. Mead,* 16 MJ 270, 275 (CMA 1983).

Additionally, we have touched upon jury nullification in certain, more narrow contexts. In the sentencing area, for instance, we have stated that jury nullification is impermissible when the Code provides for a mandatory minimum sentence and that any such sentence nullification would be subject to reconsideration or a rehearing. *United States v. Shroeder,* 27 MJ 87, 90 n. 1 (CMA 1988). Moreover, we have held that the concept of jury nullification does not provide a basis for overturning a military judge's refusal to permit defense counsel to question prospective court members about their views on the statutory mandatory-life sentence for premeditated murder. *United States v. Smith,* 27 MJ 25, 29 (CMA 1988); *see generally United States v. Jefferson,* 22 MJ 315, 329 (CMA 1986) (During closing argument on findings, military judge "directed defense counsel to refrain from informing the members that the minimum sentence for felony-murder under Article 118(4) was confinement for life.").

On the basis of these precedents, we now consider the granted issue, which requires us to determine whether the military judge erred by refusing to give the jury nullification instruction requested by appellant. Thereafter, we will consider the aspect of the granted issue that asks whether the military judge's response otherwise prejudiced the substantial rights of appellant. *See* Art. 59(a), UCMJ, 10 USC § 859(a).

## II

With respect to jury nullification, the issue can be reduced to whether the power of a court-martial panel to "disregard instructions on matters of law" exists: (1) on the one hand, because the accused has a legal right to a panel that is authorized to disregard the law, or (2) on the other hand, as a collateral consequence of other policies, such as the requirement for a general verdict, the prohibition against directing a guilty verdict, the protection against double jeopardy, and the rules that protect the deliberative process of a court-martial panel. *See generally* Warshawsky, *Opposing Jury Nullification: Law, Policy, and Prosecutorial Strategy,* 85 Geo. L.J. 191, 208–10 (1996).

### A

The Sixth Circuit faced circumstances similar to the present case in *United States v. Krzyske,* 836 F.2d 1013 (6th Cir.1988), where the jury raised a question about the nullification power. The defendant, a self-styled tax protester, was charged with tax evasion and failure to file returns. The trial court denied his request for a jury nullification instruction but also denied the Government's motion to prohibit use of the term. Consequently, defense counsel mentioned the power of jury nullification during closing argument. After several hours of deliberation, the jury returned to the courtroom and asked the trial judge about the meaning of the term. The judge responded that there was "no such thing as valid jury nullification" and admonished the jury that they were obligated "to follow the instructions of the Court as to the law given to you." *Id.* at 1021.

On appeal, the Sixth Circuit noted: "Although jurors may indeed have the power to ignore the law, their duty is to apply the law as interpreted by the court and they should be so instructed." *Id.,* quoting *United States v. Avery,* 717 F.2d 1020 (6th Cir.1983). The court emphasized the clear distinction between the powers of the judge and the powers of the jury: "A jury's 'right' to reach any verdict it wishes does not . . . infringe on the duty of the court to instruct the jury only as to the correct law applicable to the particular case." 836 F.2d at 1021. The court added:

> The right of a jury, as a buffer between the accused and the state, to reach a verdict despite what may seem clear law must be kept distinct from the court's duty to

uphold the law and to apply it impartially.... To have given an instruction on nullification would have undermined the impartial determination of justice based on law.

*Id.* (citations omitted).

A similar view, distinguishing between the raw power of a jury to return a verdict and its duty to follow the law, was expressed by the First Circuit in *United States v. Boardman*, 419 F.2d 110, 116 (1969): "Today jurors may have the power to ignore the law, but their duty is to apply the law as interpreted by the court, and they should be so instructed." *Accord United States v. Washington*, 705 F.2d 489, 494 (D.C.Cir.1983) ("A jury has no more 'right' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty,' and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.").

In *United States v. Moylan*, 417 F.2d 1002, 1006 (1969), the Fourth Circuit observed that the power of nullification is the result of the requirement for a general verdict in criminal cases:

[T]he undisputed power of the jury to acquit, even if its verdict is contrary to the law as given by the judge and contrary to the evidence ... is a power that must exist as long as we adhere to the general verdict in criminal cases, for the courts cannot search the minds of the jurors to find the basis upon which they judge. If the jury feels that the law under which the defendant is accused is unjust, or that exigent circumstances justified the actions of the accused, or for any reason which appeals to their logic or passion, the jury has the power to acquit, and the courts must abide by that decision.

While recognizing this "power," the court in *Moylan* rejected the notion that the jury should have been instructed that it had such a power. The court quoted Justice Harlan's opinion for the Supreme Court in *Sparf v. United States*, 156 U.S. 51, 101–02, 15 S.Ct. 273, 293, 39 L.Ed. 343 (1895), which stated:

Public and private safety alike would be in peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves.... We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence.

Proponents of nullification have contended that jury nullification historically is rooted in notions relating to citizens' ability to check the exercise of discretion by their rulers and political leaders and that express recognition of this power is necessary in a democratic society. *See* W. LaFave and J. Israel, 2 *Criminal Procedure* § 21.1(g) at 760 (1984). Modern-day [6] courts have not looked favorably on this contention, however. The court in *Moylan*, for example, observed that

[t]o encourage individuals to make their own determinations as to which laws they will obey and which they will permit themselves as a matter of conscience to disobey is to invite chaos. No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable. Toleration of such conduct would not be democratic, as appellants claim, but inevitably anarchic.

417 F.2d at 1009; *accord Washington*, 705 F.2d at 494 (jury nullification instructions "could encourage the substitution of individual standards for openly developed community rules"); *United States v. Gorham*, 523 F.2d 1088, 1098 (D.C.Cir.1975) ("The right to equal justice under law inures to the public as well as to individual parties to specific litigation, and that right is debased when juries at their caprice ignore the dictates of established precedent and procedure.");

---

**6.** The historical evolution of American legal doctrine on the subject of jury nullification is outlined in Warshawsky, *Opposing Jury Nullification: Law, Policy, and Prosecutorial Strategy*, 85 Geo.L.J. 191, 198–203 (1996).

*United States v. Dougherty*, 473 F.2d 1113, 1133 (D.C.Cir.1972) ("This so-called right of jury nullification is put forward in the name of liberty and democracy, but its explicit avowal risks the ultimate logic of anarchy.").

In addition to opinions of the First, Fourth, Sixth, and D.C. Circuits discussed *supra*, the view that jury nullification should be recognized or encouraged has been rejected by the Seventh Circuit in *United States v. Anderson*, 716 F.2d 446, 449–50 (1983); the Eighth Circuit in *United States v. Wiley*, 503 F.2d 106, 107 (1974); the Ninth Circuit in *United States v. Simpson*, 460 F.2d 515, 518–20 (1972); and the Eleventh Circuit in *United States v. Trujillo*, 714 F.2d 102, 105–06 (1983). No federal court of appeals has rendered a contrary decision, and Maryland and Indiana apparently are the only two states that permit juries to overrule judges on matters of law. Korroch and Davidson, *Jury Nullification: A Call for Justice or an Invitation to Anarchy?*, 139 Mil.L.Rev. 131, 139 (1993), citing V. Hans and N. Vidmar, *Judging the Jury* 157 (1986).

### B

Advocates of jury nullification suggest that the power to nullify provides a necessary means of permitting the jury to act as the conscience of the community to prevent mistaken or overzealous prosecutions. These goals are served by other rules, however, such as the requirement for a general verdict, the prohibition against directing a guilty verdict, the protection against double jeopardy, and the rules that protect the deliberative process of a court-martial panel.

Also, it is important to recognize that, as a result of the protections surrounding jury deliberations, the consequences of nullification are not limited to the lofty goal of protecting defendants against mistaken or overzealous prosecutions. A jury, exercising the power of nullification, is not limited to acquittal; it also may convict when fear, prejudice, ignorance, or mistake lead the panel to disregard the judge's instructions on the elements

of an offense, the standard of reasonable doubt, or the need to exclude or limit consideration of objectionable testimony. In most circumstances, such considerations, even though improper, cannot be used to impeach a jury's decision, except in very limited circumstances provided for in Mil.R.Evid. 606(b), Manual for Courts–Martial, United States (1995 ed.), and its civilian counterpart.[7]

Moreover, although advocates of nullification tend to focus on crimes involving deeply held moral or political views, the power of nullification is not so restricted. *See* Warshawsky, 85 Geo.L.J. at 219–20. An instruction on nullification could lead jurors to believe that it is appropriate to condone a wide variety of misconduct that may have little or no connection to a deeply held moral view, such as violations of the civil rights laws, sexual harassment, vigilantism, and tax fraud. To reiterate the pointed observation of the District of Columbia Circuit in *Gorham*, 523 F.2d at 1098: "The right to equal justice under law inures to the public as well as to individual parties to specific litigation, and that right is debased when juries at their caprice ignore the dictates of established precedent and procedure."

### C

The same considerations that militate against endorsing jury nullification in civilian criminal trials apply in the military justice system. As in civilian trials, there are clear divisions of responsibility between the military judge and the members of a court-martial panel. The military judge is vested with the authority to "rule on all interlocutory questions and all questions of law raised during the court-martial" and to "[i]nstruct the members on questions of law and procedure which may arise." RCM 801(a)(4) and (5), Manual, *supra*. Interlocutory questions and questions of law are "presented and decided at sessions held without members...." RCM 801(e)(1)(C). The rulings of a military

---

7. *See* Fed.R.Evid. 606(b).

judge on such questions are "final." RCM 801(e)(1)(A).

The members of a court-martial are vested with authority to "determine whether the accused is proved guilty and, if necessary, adjudge a proper sentence, based on the evidence and *in accordance with the instructions of the military judge.*" RCM 502(a)(2) (emphasis added). The members deliberate and vote on findings and sentence in closed session with only the members present, using a secret ballot. RCM 921, 1004(b)(7), and 1006.

As a general matter, the deliberations of courts-martial panels are privileged to the same extent as are the deliberations of other courts and grand and petit juries. Mil. R.Evid. 509. "[A] member may not testify as *to any matter or statement occurring during* the course of the deliberations of the members of the court-martial or, to the effect of anything upon the member's or any other member's mind or emotions as influencing the member to assent to or dissent from the findings or sentence or concerning the member's mental process in connection therewith...." Mil.R.Evid. 606(b). There are only three very narrow exceptions to this rule, which permit a member to testify "on the question whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial, whether any outside influence was improperly brought to bear upon any member, or whether there was unlawful command influence." *Id.*[8]

The protections of the deliberative process complement the manner in which the court-martial panel functions. The military judge, like his or her civilian counterpart, cannot direct the panel members to accept the judge's findings of facts, nor can the judge direct the members to return a verdict of guilty. A court-martial panel, like a civilian jury, returns a general verdict and does not specify how the law applies to the facts, nor does the panel otherwise explain the reasons for its decision to convict or acquit.[9] *See* Forms of Findings, App. 10, Manual, *supra*, referenced in RCM 921(d), Discussion; *see also* RCM 921(d), Discussion ("The president [of the panel] should not disclose any specific number of votes for or against any finding."); RCM 1006(e), Discussion ("The president [of the panel] should not disclose any specific number of votes for or against any sentence.").

Under the constitutional and statutory protections against double jeopardy, an announced decision to acquit is final. The decision cannot be impeached, and the accused cannot be retried, even when the members have disregarded the law through either mistake or design. *See* U.S. Const. amend. V; Art. 44, UCMJ, 10 USC § 844. "However mistaken or wrong it may be, an acquittal cannot be withdrawn or disapproved."[10] *United States v. Hitchcock,* 6 MJ 188, 189 (CMA 1979), citing *Fong Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629 (1962). Members of a court-martial cannot be punished, directly or indi-

8. Mil.R.Evid. 606(b), Manual for Courts–Martial, United States (1995 ed.), strikes a balance "between the necessity for accurately resolving criminal trials in accordance with rules of law on the one hand, and the desirability of promoting finality in litigation and of protecting members from harassment and second-guessing on the other hand." S. Saltzburg, L. Schinasi, and D. Schlucter, *Military Rules of Evidence Manual* 633 (3d ed.1991).

9. A slight deviation from this general practice is required during sentencing in capital cases. Where a court-martial adjudges a sentence that includes death, the votes that lead to that sentence must be unanimous, *see* RCM 921(c)(2)(A) and 1004(b)(4), Manual, *supra,* and the president of the panel must "announce which aggravating

factors ... were found by the members." RCM 1004(b)(8).

10. When a court-martial panel does not return a mandatory minimum sentence to life imprisonment for conviction of premeditated murder in violation of Article 118(1), UCMJ, 10 USC § 918(1), however, there is no sentencing counterpart to the double-jeopardy protection that restricts remedial action. We have noted that any sentence that does not include a mandatory minimum is unlawful and may be corrected through reconsideration or by a sentence rehearing ordered by the convening authority. *Garrett v. Lowe,* 39 MJ 293, 296 (CMA 1994); *United States v. Shroeder,* 27 MJ 87, 90 n. 1 (CMA 1988); *see* RCM 1009(b)(1) and (d).

rectly, for their verdict. *See* Art. 37, UCMJ, 10 USC § 837.

## D

The fact that a jury has the power to acquit (as well as convict) by disregarding the instructions of the judge on matters of law does not mean that the panel must be told that it is permissible for them to ignore the law. That raw power is the result of the premium our legal tradition places on the prohibition against double jeopardy, the virtues of a general verdict in criminal cases, and the protections that are accorded to a jury's deliberative process. That raw power, however, does not equate to a legal right. *See generally* Warshawsky, 85 Geo.L.J. at 197–98 and 208–09.

Congress and the President have made similar judgments with respect to the rules governing the military justice system. This does not mean that they want or expect court-martial panel members to disregard the law; only that they have determined that the values of a general verdict, the prohibition against double jeopardy, and the protection of the deliberative process outweigh the consequences of an occasional disregard of the law by a court-martial panel.

## E

Even if civilian courts were to permit jury nullification instructions, we would have serious reservations about permitting similar instructions in the military justice system. While there are many similarities between civilian jurors and members of a court-martial panel, there are important differences. Contrary to the assertion of defense counsel at trial that court-martial members are empowered to exercise "peer discretion," a court-martial panel is not composed of a randomly selected group of the peers of the accused. Instead, in its wisdom, Congress has determined that members of the armed forces should be subject to trial before a panel of members who are personally selected by a military commander, rather than a randomly selected group of one's peers. *See United States v. McClain*, 22 MJ 124, 128 (CMA 1986); *cf. United States ex rel. Toth*

*v. Quarles*, 350 U.S. 11, 17–18, 76 S.Ct. 1, 5–6, 100 L.Ed. 8 (1955). Membership on a court-martial panel is limited statutorily by Congress to those who "are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Art. 25(d)(2), UCMJ, 10 USC § 825(d)(2); RCM 502(a).

■ A military accused "has a Sixth Amendment right to a fair and impartial jury" as factfinder, *see United States v. Curtis*, 44 MJ 106, 133 (1996), *rev'd as to sentence on recon.*, 46 MJ 129 (1997), and the selection of court members and the conduct of their deliberations is governed by statutory and constitutional provisions that are designed to ensure fair and impartial consideration. *See United States v. McClain, supra.* Neither Congress nor the President, however, has authorized a court-martial panel to pick and choose among the laws and rules that are applicable to military life in order to determine which ones should be obeyed by members of the armed forces. A jury nullification instruction would provide court members with an authoritative basis to determine that service members need not obey unpopular, but lawful, orders from either their civilian or military superiors. To permit such action would be antithetical both to the fundamental principle of civilian control of the armed forces in a democratic society and to the discipline that is essential to the successful conduct of military operations.

Moreover, such an instruction might breed a disrespect for the rule of law that could undermine protections for the rights of accused persons in the armed forces. Military personnel are trained to obey the law, including the instructions of military judges in courts-martial. A primary protection of individual rights for members of the armed forces is found in the instruction of court-martial panels in the rights of service members by military judges and the willing acceptance by members of court-martial panels of their responsibility to follow those instructions, regardless of their personal beliefs as to the wisdom of those protections.

## F

■ Consistent with the views of the federal courts of appeals that have consid-

ered this issue and in view of our own analysis of the military justice system, we hold that a court-martial panel does not have the right to nullify the lawful instructions of a military judge. To the extent that a court-martial panel has the power to render a decision that does not follow the judge's instructions, it is the collateral consequence of the rules concerning the requirement for a general verdict, the prohibition against a directed guilty verdict, the protection against double jeopardy, and the rules that protect the deliberative process of a court-martial panel. Because there is no "right" of jury nullification, the military judge in this case did not err either in declining to give a nullification instruction or in declining otherwise to instruct the members that they had the power to nullify his instructions on matters of law.

### III

■ Appellant contends that, even if the military judge was not required to instruct the court-martial panel on the issue of jury nullification, the military judge's response to the members' question was erroneous otherwise.

The members posed the following question to the military judge: "[I]f we find that both—that all elements of the charge are present, that does not necessarily mean that we still have to find the defendant guilty of that charge, is that correct?" In response, the military judge said, "Well, you have to consider all the instructions that I gave you regarding the elements of the offense and the applicable defenses."

After the president of the panel acknowledged the military judge's response, the judge continued:

You have to determine in your own mind whether you believe that the government has proved it's [sic] case, that the accused is guilty beyond a reasonable doubt. If you believe that the government has proven each and every element of an offense beyond a reasonable doubt, but, as an example, on mistake of fact, the government has failed to carry its burden on mistake of fact, then the government has failed to prove its case and *you should find—you*

*should vote not guilty.* But you have to look at the elements and apply the defenses to the elements and determine whether the accused is guilty or not guilty to a particular specification and charge, and it's a combination of elements and the defenses that apply to those particular specifications.

(Emphasis added.) Appellant contends that the judge erred when he told the members that they "should vote not guilty" if the Government failed to carry its burden of proof; instead, appellant argues, the members "must" vote not guilty if there is a failure of proof. *See* Art. 51(c)(2), UCMJ, 10 USC § 851(c)(2); *United States v. Verdi,* 5 MJ 330, 334 (CMA 1978).

The comments of the military judge should be considered in the context of the specific question raised by the members and the full body of the instructions given by the military judge, both at this point in the proceedings and prior to the initial deliberations of the members. *See generally United States v. Bradley,* 28 MJ 197, 202 (CMA 1989) (challenged instruction viewed in context of full instructions, not in isolation).

The question from the members raised the issue of jury nullification, as well as the availability of affirmative defenses. The question did not raise the issue of whether the members could convict appellant despite a failure of proof, and the military judge's response should be considered in that context. Moreover, the detailed closing instructions by the military judge before findings' deliberations began made it clear that the Government had all of the burden of proof; that appellant was presumed innocent until the Government carried its burden; and that the members could find appellant guilty "only if [they were] convinced that each element [was] established by legal and competent evidence beyond a reasonable doubt" and that the affirmative defenses did not exist beyond a reasonable doubt. *See* RCM 916(b).

Appellant did not object to the use of the phrase "should vote not guilty" in the military judge's response to the question from the members. If there was any ambiguity

raised by the military judge's response, the time to seek clarification was at trial. The failure to do so underscores our conclusion—based upon the full context of the question, the response, and the other instructions by the military judge—that the military judge's response to the specific question from the members did not detract from the validity of his detailed instructions on the burden of proof; nor did his response otherwise have the effect of granting the members discretion to convict even if the Government had failed to carry its burden.[11]

In any event, appellant also has difficulty demonstrating any prejudice because the phrase "should vote not guilty" was not used in the context of a charge for which he was convicted. The phrase was used by the military judge to illustrate the panel's responsibility if they determined that the Government had proved all of the elements of an offense but had failed to carry its burden on mistake of fact. In this case, however, mistake of fact was not at issue on the charge for which appellant stands convicted (forcible sodomy) but applied only to the charge for which he was acquitted (rape).

## IV

■ Appellant also claims the military judge erred by "answer[ing] a significant [legal] question without [first] consulting with counsel or consulting any legal reference materials." Although it is prudent for a military judge to consult with counsel in the interest of avoiding an inadvertent misstep, the Government is correct that there is no legal requirement to do so prior to answering a question from the members. *But cf.* RCM 920(c)("Each party shall be given the opportunity to be heard on any proposed instruction on finding before it is given.").

In the case relied upon by appellant, *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), the judge's error was in not notifying the parties that the jury had asked a question; instead, the judge answered the question without the parties even knowing that one had been asked. The Court held that to be a denial of the defendant's right to be present during trial. Here, in contrast, the question was asked and answered in open court with appellant present. The parties, with appellant present, then had the opportunity to discuss the matter further with the military judge in an Article 39(a) session. In these circumstances, *Rogers* is not applicable. Moreover, in view of the fact that the only action requested by defense counsel was a jury nullification instruction, which we find to not be consistent with applicable law, appellant suffered no prejudice as a result of the military judge's decision to respond to the panel's question prior to consulting with the parties.

## V

The decision of the United States Army Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN, CRAWFORD, and GIERKE concur.

11. Although we have addressed this claim on the merits, defense counsel's inaction also would provide a basis for finding waiver through the failure to object at trial. *See* RCM 920(f).